OPINION OF THE COURT
Michael D. Stallman, J.
Three companies in the business of outdoor advertising have each brought lawsuits against the City of New York, challenging the City’s authority and jurisdiction to regulate signs erected on railroad rights-of-way or affixed to railroad trestles and overpasses. These three companies, along with the Metropolitan Transportation Authority, maintain that the City’s land use law and regulation are preempted by state law.
This decision discusses all three lawsuits, CBS Outdoor Inc. v City of New York (index No. 100394/2013), Lamar Adv. of Penn, LLC v City of New York (index No. 100397/2013) and Clear Channel Outdoor, Inc. v City of New York (index No. 100398/2013), which involve common issues of law and fact.[1]
L
Petitioners-plaintiffs CBS Outdoor, Inc. and Lamar Advertising of Penn, LLC and petitioner Clear Channel Outdoor, Inc. are engaged in the business of outdoor advertising.
CBS Outdoor alleges that, in 2000, its corporate parent purchased the stock of Outdoor Systems, Inc., whose assets included “a significant portfolio of outdoor advertising structures located in the New York City Market, including many advertising signs located on railroad properties.” (CBS Outdoor second amended verified petition-complaint ¶ 33.) Lamar similarly alleges that, in 2008, its corporate parent purchased the stock of Vista Media Group, Inc., whose assets also included many advertising signs located on railroad properties. (Lamar verified petition-complaint ¶ 29.)
*286 The signs at issue in these three lawsuits are signs within New York City that are located on, or are affixed to, property owned or leased by either petitioner-plaintiff Metropolitan Transportation Authority (MTA) or respondent-defendant CSX Transportation, Inc. (CSXT).[2] CBS Outdoor specifically alleges that all of its signs on MTA property “are erected on railroad rights-of-way or affixed to railroad trestles and overpasses,” which are “used every day for railroad transportation purposes.” {Id. ¶ 22 n 4.) According to petitioners-plaintiffs, in 2011, the MTA received more than $116 million in revenue from advertising, which included “signs displayed in subway and commuter rail stations, inside subway and commuter rail cars and buses, on the sides and tails of buses, and on freestanding signs erected on or affixed to MTA property.” (CBS Outdoor second amended verified petition-complaint ¶ 79; Lamar petition-complaint ¶ 74; Clear Channel petition ¶ 4.)
A.
The City of New York regulates outdoor advertising. The history of such regulation was extensively recounted in a 2009 decision in a federal lawsuit started in 2006 between Clear Channel and the City of New York (Clear Channel Outdoor, Inc. v City of New York, 608 F Supp 2d 477, 481-484 [SD NY 2009], affd 594 F3d 94 [2d Cir 2010], cert denied sub nom. Metro Fuel LLC v City of New York, N.Y., 562 US 981 [2010]). The decision states, in relevant part:
“In 1940, New York City restricted outdoor advertising signs in districts zoned for residential use and in all areas within 200 feet and in view of arterial highways and City parks larger than one-half acre. At that time the City Planning Commission (‘CDP1’) determined that billboard regulation was needed because ‘Millboards and signs not only dominate our business streets . . . but they take *287 advantage of every opportunity to crowd in upon public places, established and maintained by public funds, including civic centers, parks, and especially express highways and bridge approaches.’. . .
“In 1961 the City adopted a comprehensive Zoning Resolution which carried on the general framework from the 1940 regulations. ... In 1979-80, as the City’s fiscal crisis was coming to an end, the City faced a loss of $25 million in federal highway aid, unless it complied with the Federal Highway Beautification Act and enforced provisions of its Zoning Resolution. In 1980, after determining that enforcement was economically impracticable, the City grandfathered the outdoor signs that did not comply with the Zoning Resolution but did comply with less restrictive federal and state standards. Thus, many signs existing on or before November 1, 1979 were granted ‘non-conforming use’ status and remain exempt to this day from the ban on arterial advertising. . . .
“From 1980 until the late 1990s the City minimally enforced the arterial advertising restrictions.
“In 1998 the City amended the Zoning Resolution to clarify that non-commercial signs were permitted wherever any other types of signs were permitted. . . .
“In February 2001, the New York City Council amended the Zoning Resolution to reduce and limit the size of all accessory signs near arterial highways and to establish size, height, and projection requirements for all signs in districts zoned as manufacturing. . . .
“At the same time that it amended the Zoning Resolution, the City Council also amended the Administrative Code to provide for an enhanced enforcement and penalty scheme for sign regulation. . . . Mayor Giuliani signed the amendment as Local Law 14/2001 (‘Local Law 14’) on March 19, 2001. Local Law 14 created a registration scheme requiring all outdoor advertising companies to register their arterial signs with the Department of Buildings (‘DOB’). . . .
“[I]n 2003, the City Council again amended the registration requirements. The amendments were relatively minor, but they clarified that outdoor *288 advertising companies were required to provide the DOB with an inventory of all signs within 900 feet and within view of an arterial highway. The amendments were eventually signed into law by Mayor Bloomberg in 2005 as Local Law 31.
“As before, Local Law 31 did not take effect until the DOB promulgated a rule, which it did by publishing the proposed rules in the City Record on August 15, 2005. The DOB eventually held public hearings and the regulations—now known as Rule 49—went into effect on August 25, 2006.” (Clear Channel Outdoor, Inc., 608 F Supp 2d at 482-484 [footnotes and citations omitted].)
According to petitioners-plaintiffs, throughout the history of the City’s regulation of outdoor advertising, the City had never previously taken enforcement actions against advertising signs on railroad properties, under the belief that signs on MTA property and facilities were not subject to the jurisdiction of the City’s Department of Buildings (DOB). (CBS Outdoor second amended verified petition-complaint ¶¶ 62-71.) CBS Outdoor states that DOB had compiled a citywide inventory of arterial highway signs, and that headings on pages from that inventory state, “Railroad Arterial Highway Signs No Jurisdiction by this Department.” {Id. ¶ 67; exhibit J.) CBS Outdoor also submits a purported copy of a dismissal of a violation issued from DOB in Queens. {Id., exhibit K.) The dismissal, which appears to be dated July 25, 1986, states, “This is Railroad Property and it is our belief it does not come under the zoning regulations of New York City.” {Id.)
According to petitioners-plaintiffs, the City reversed its position in the Clear Channel federal lawsuit, ostensibly to defeat Clear Channel’s arguments in the federal lawsuit that Local Law No. 14 (2001) of City of New York and Local Law No. 31 (2005) of City of New York were unconstitutional.
B.
The New York City Construction Codes require outdoor advertising companies to register with DOB, and to provide DOB with an inventory of their outdoor advertising signs, sign structures, and sign locations that are within 900 feet and within view of an arterial highway. (Administrative Code of City of NY § 28-502.4; 1 RCNY 49-15 [a].)
CBS Outdoor submitted registrations for nine signs on property owned or under control of the MTA and 12 signs on *289 property owned by CSXT; Clear Channel submitted registrations for three signs on MTA property; Lamar submitted a registration for one sign on MTA property.
On March 26, 2012, May 10, 2012 and August 8, 2012, DOB borough commissioners for Queens and the Bronx issued notice of sign registration rejection letters denying registration for these signs. According to the City, these signs are located in areas of the city where advertising is generally not allowed because the sign is too close to an arterial highway, and in some instances, because the sign is also in a residential or low-density commercial zoning district. (City’s answer to CBS Outdoor second amended verified petition-complaint ¶ 98.)
CBS Outdoor, Lamar, and Clear Channel appealed the denials to the Board of Standards and Appeals (BSA), which held a public hearing and then a public meeting on the applications. With the consent of the three companies, the BSA reviewed the appeal applications together on the same hearing calendar.[3]
Following the public meeting on January 29, 2013, the BSA issued a resolution, by a 3-2 vote, denying the appeals of CBS Outdoor, Lamar and Clear Channel with respect to the 13 signs on MTA property. (CBS Outdoor second amended verified petition-complaint, exhibit A.) The BSA issued a unanimous resolution denying CBS Outdoor’s applications with respect to the 12 signs on CSXT property. (Id.)[4] These three lawsuits followed. Petitioners-plaintiffs maintain that DOB’s reversal was unlawful, arbitrary, and capricious. They seek to vacate and annul DOB’s rejection of their applications to register their outdoor signs, and the resolutions of the BSA, which upheld DOB’s rejection. Petitioners-plaintiffs also seek declarations that Local Law 14, Local Law 31, and title 1, chapter 49 of the Rules of the City of New York (Rule 49), which govern outdoor signs, do not apply to property or facilities owned, leased, or *290 controlled by the MTA[5] or CSXT. Petitioners-plaintiffs seek a permanent injunction against the City, the BSA, and DOB from enforcing Local Law 14, Local Law 31, and Rule 49 against any outdoor advertising signs erected on, or affixed to, any property or facilities owned, leased, or controlled by the MTA or CSXT.
Finally, petitioners-plaintiffs maintain that, even if they were not entitled to the relief sought, they should be entitled to a judgment declaring that enforcement of Local Law 14, Local Law 31, and Rule 49 as to these signs would amount to an unconstitutional regulatory taking, which would thereby entitle petitioners-plaintiffs to just compensation.
IL
Respecting the signs on MTA property, the issue presented is whether the MTA and these MTA facilities are exempt from the City’s Zoning Resolution, Local Law 14, Local Law 31, and Rule 49, by virtue of Public Authorities Law § 1266 (8). It is undisputed that the MTA has the power to enter into contracts for advertising on its own property. However, if applicable to the MTA, the City’s Zoning Resolution, local laws, and regulations would prohibit outdoor advertising signs from being placed on some MTA property.
Public Authorities Law § 1266 (8) contains two sentences relevant to this inquiry:
“Except as hereinafter specially provided, no municipality or political subdivision, including but not limited to a county, city, village, town or school or other district shall have jurisdiction over any facilities of the authority and its subsidiaries, and New York city transit authority [NYCTA] and its subsidiaries, or any of their activities or operations. The local laws, resolutions, ordinances, rules and regulations of a municipality . . . conflicting with this title [title 11 of the Public Authorities Law] or any rule or regulation of the [MTA] or its subsidiaries, or [NYCTA] or its subsidiaries, shall not be applicable to the activities or operations of the [MTA] and its subsidiaries, and [NYCTA], or the facilities of the [MTA] and its subsidiaries, and [NYCTA] *291 and its subsidiaries, except such facilities that are devoted to purposes other than transportation or transit purposes.” (Emphasis supplied.)
Petitioners-plaintiffs argue that the first sentence, that which discusses the “jurisdiction” of municipalities over MTA facilities, operates independently from the next sentence, which discusses the inapplicability of conflicting local laws, resolutions, ordinances, rules and regulations. However, two courts have ruled that the “blanket prohibition” of jurisdiction is “qualified by a subsequent provision which provided ‘that only local laws that conflict[ed]’ with the Public Authorities Law should be inapplicable and, then, only as to ‘facilities . . . devoted to . . . transportation and transit services.’ ” (Parker v Metropolitan Transp. Auth., 17 Misc 3d 1112[A], 2007 NY Slip Op 51931[U], *4 [Sup Ct, Kings County 2007], citing Bogdan v New York City Tr. Auth., 2005 WL 1161812, 2005 US Dist LEXIS 9317 [SD NY, May 17, 2005, No. 02-Civ-09587(GEL)].) Indeed, the qualification is set forth in the language at the beginning of the sentence itself, “Except as hereinafter specifically provided.”
By its terms, Public Authorities Law § 1266 (8) expressly provides that local laws and rules that are “in conflict” are inapplicable to MTA facilities, except for “facilities that are devoted to purposes other than transportation or transit purposes.” The statutory exemption therefore appears to raise two questions: (1) whether the local laws and regulations at issue are “in conflict” with title 11 of article 5 of the Public Authorities Law or any rule or regulation of the MTA or its subsidiaries; and (2) assuming a conflict exists, whether the facilities at issue are “devoted to purposes other than transportation or transit purposes.”
However, the first reported case interpreting Public Authorities Law § 1266 (8) did not follow such an approach. In People v Witherspoon (52 Misc 2d 320 [Suffolk Dist Ct 1966]), the court held that a town’s zoning ordinance concerning billboards and advertising signs was applicable to an advertising company that leased land from the Long Island Rail Road Company, and its statutory successor, the Metropolitan Commuter Transportation Authority. The court in Witherspoon analyzed the exemption from local law under Public Authorities Law § 1266 (8) as a question of governmental immunity from zoning regulations, and therefore applied a test of governmental immunity. The court stated, “If the function be governmental, then the im *292 munity may be deemed to apply. If the function be proprietary then the immunity may not apply.” (Id. at 321.) The court also stated:
“The prime purpose for the legislation was the guarantee of the continued operation of the railroad; the right to manage, direct and control the real property is incidental thereto. Insofar as such management, direction or control is directed towards the actual operation, the function is governmental. Insofar as such management, direction or control is incidental to the actual operation, the function is proprietary.” (Id. at 322-323 [emphasis omitted].)
The court reasoned that the use of property was proprietary, because “the erection and maintenance of commercial advertising signs—has no direct bearing to the governmental function for which the Metropolitan Commuter Transportation Authority was created.” (Id. at 323.)
Since Witherspoon, the majority of cases that have analyzed Public Authorities Law § 1266 (8) did not adopt the governmental-proprietary test articulated in Witherspoon. Rather, the cases focused on whether any local laws, resolutions, ordinances, and rules were “in conflict” with either title 11 of article 5 of the Public Authorities Law or any rule or regulation of the MTA, NYCTA or their subsidiaries. If a conflict existed, these cases ruled that the local laws were not applicable. If a conflict did not exist, then the MTA and NYCTA were not exempt from local law.
A.
For example, in People v Long Is. R.R. (90 Misc 2d 269 [App Term, 2d Dept 1976]), the court held that the Long Island Rail Road, an MTA subsidiary, was exempt from Suffolk County’s sanitary code for operating fuel-emitting diesel trains. In Metropolitan Transp. Auth. v Village of Tuckahoe (67 Misc 2d 895 [Sup Ct, Westchester County 1971]), the court enjoined the Village of Tuckahoe from enforcing its building code to the construction of a footbridge overpass connecting high-level platforms above a right-of-way located at a station in the village. In People v Metro-North Commuter R.R. Co. (132 Misc 2d 1072 [Crim Ct, Bronx County 1986]), the court ruled that the Metro-North Commuter Railroad, an MTA subsidiary, was exempt from the City of New York’s ordinances concerning the transportation of diesel fuel by truck on New York City streets.
*293 In Tang v New York City Tr. Auth. (55 AD3d 720 [2d Dept 2008]), the Appellate Division, Second Department ruled that the NYCTA was not exempt from the City’s Human Rights Law under Public Authorities Law § 1266 (8). The Appellate Division, Second Department stated,
“ [i] t would then appear that the Legislature did not intend to prohibit the application of all local laws to the [Transit Authority], but only of such laws that interfered with the accomplishment of its transportation purposes. Compliance with the provisions in the Administrative Code against employment discrimination would not interfere with the function and purpose of the Transit Authority.” (Tang, 55 AD3d at 720-721 [internal quotation marks and citation omitted].)
Citing Tang, the Appellate Division, Second Department stated, “Public Authorities Law § 1266 (8) does not exempt the NYCTA or its employees from all local laws affecting its activities and operations, but rather, only those ‘conflicting with this title or any rule or regulation’ of the NYCTA.” (Bumpus v New York City Tr. Auth., 66 AD3d 26, 37 [2d Dept 2009].)
The appellate cases from the Second Department appear to suggest that if the local law does not “interfere with the function and purpose” of the MTA, the NYCTA and their subsidiaries, then the local law would apply to them. (See Terranova v New York City Tr. Auth., 49 AD3d 10, 15 [2d Dept 2007] [“the second prong of the exemption merely defines the victor in a conflict between the Transit Authority’s regulations and those of local government, and there does not appear to be any such conflict here”].)
In Echevarria v New York City Tr. Auth. (45 AD3d 492 [1st Dept 2007]), the Appellate Division, First Department ruled that a trial court correctly instructed a jury that the NYCTA had a duty under Administrative Code § 16-123 to remove snow and ice from an exterior landing, notwithstanding Public Authorities Law § 1266 (8). The Appellate Division, First Department reasoned that New York City’s local law requiring snow and ice removal was applicable to the NYCTA because “defendant was acting in a proprietary rather than governmental capacity, and its maintenance of the landing does not conflict or interfere with its governmental function or purpose.” (Echevarria, 45 AD3d at 492.) Thus, Echevarria appeared to combine the governmental-proprietary distinction first articulated in Witherspoon with the test of “conflict” articulated in *294 Tang, i.e., interference with the NYCTA’s governmental function and purpose.
Here, petitioners-plaintiffs argue that the City’s action conflicts with the MTA’s purpose, which is to generate revenue to fund transportation. (CBS Outdoor supplemental mem at 6.) As both CBS Outdoor and the MTA argue, the MTA was created to finance regional transportation. In creating the Metropolitan Commuter Transportation Authority, the predecessor to the MTA, the legislature found and declared, among other things, that
“2. The continued deterioration of the financial situation and physical condition of the Long Island Rail Road, the New York, New Haven and Hartford Railroad and other companies providing rail commuter transportation services constitutes a serious threat to the economic well-being of the state. . . .
“6. The urgent and immediate need for the stabilization, strengthening and improvement of commuter services for the transportation of persons in the metropolitan area can be met by the creation of a public authority to serve as the state’s instrument for the carrying out of programs designed to continue and improve commuter services.
“7. Through such public authority the state could deal flexibly and efficiently with the differing financial, managerial and operational problems involved in insuring the continuation of such essential commuter services as those presently being provided by the Long Island Rail Road and the New York, New Haven and Hartford Railroad.
“8. It is declared to be the policy of the state that the preservation, strengthening and improvement of commuter services is an essential public purpose, and that it is in the public interest for the state and its political subdivisions, in cooperation with other levels of government, to take appropriate measures and assume responsibilities for the preservation for such essential services.” (L 1965, ch 324, § 1.)
In 1967, the legislature renamed the Metropolitan Commuter Transportation Authority as the MTA. The legislature continued the New York City Transit Authority, Triborough Bridge and Tunnel Authority, and Manhattan and Bronx Surface Transit Operating Authority as separate entities, while placing them under the effective control of the MTA. The legislature *295 found and declared that “it is the purpose of this title to place each of these authorities under common control by a single board and to impose upon that board the additional responsibility of developing and implementing a unified mass transportation policy for such region.” (L 1967, ch 717, § 60.)
Public Authorities Law § 1264 (1) states, in relevant part, “The purposes of the authority shall be the continuance, further development and improvement of commuter transportation and other services related thereto within the metropolitan commuter transportation district, including but not limited to such transportation by railroad, omnibus, marine and air, in accordance with the provisions of this title.” The legislation creating the MTA therefore gave the MTA the power, among other things, to borrow money, issue notes and bonds, invest funds, and enter into contracts and leases. (See Public Authorities Law § 1265.)
Insofar as application of the local laws at issue would result in a loss of revenue to the MTA from outdoor advertising, the court agrees with petitioners-plaintiffs that a conflict exists under Public Authorities Law § 1266 (8), i.e., that the loss of revenue from compliance with the local laws and regulations at issue would interfere with the accomplishment of the MTA’s function and purpose of, among other things, generating revenue to fund public regional transportation. It is as true today as when the MTA and its predecessor were created that adequate funding of essential commuter services—which the legislature declared a public interest of the state and its political subdivisions—remains a pressing problem with no clear solution.
B.
As discussed above, Public Authorities Law § 1266 (8) provides that local laws that are “in conflict” are not applicable to MTA facilities, except for “facilities that are devoted to purposes other than transportation or transit purposes.” The parties disagree as to whether the use of a railroad right-of-way for outdoor advertising means that the facility is “devoted to purposes other than transportation or transit purposes” under the statute. For petitioners-plaintiffs, the words “transportation or transit purpose” includes any use of MTA property, such as outdoor advertising, that generates revenue that will pay for the MTA’s operations, which consequently furthers the purpose for which the MTA was created. (See CBS *296 Outdoor reply mem at 5.) For the City, the meaning of “transportation or transit purpose” is much narrower; the City apparently considers “transportation or transit purpose” as the movement or conveyance of people. Quoting Tang, the City asserts that the application of the outdoor advertising prohibitions on outdoor advertising contained in the City’s Zoning Resolution will not interfere with the MTA’s “accomplishment of its transportation purposes,” because these regulations would not impact upon the MTA’s ability to keep the trains moving. (City’s supplemental mem at 3.)
Moreover, the City argues that the MTA facilities at issue are not devoted to a transportation or transit purpose because the outdoor signs on the facilities are not about transportation or transit. (See City’s mem at 7, 12-13.) The City concludes that such a facility is therefore devoted to purposes other than transportation or transit purposes. Otherwise, the City argues,
“the MTA could, theoretically, construct a giant hotel, Home Depot, or car dealership on its property, without regard to otherwise applicable height and bulk regulations set forth in the City’s Zoning Resolution simply because the establishment would pay rent to the MTA and the MTA would use that rent to aid in financing its maintenance of rail transportation.” (City’s mem at 7.)
“In matters of statutory interpretation, our primary consideration is to discern and give effect to the Legislature’s intention. As we have repeatedly stated, the text of a provision ‘is the clearest indicator of legislative intent and courts should construe unambiguous language to give effect to its plain meaning.’ Additionally, we should inquire ‘into the spirit and purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history.’ ” (Matter of Albany Law School v New York State Off. of Mental Retardation & Dev. Disabilities, 19 NY3d 106, 120 [2012] [citations omitted].)
“[T]he legislative history of an enactment may also be relevant and ‘is not to be ignored, even if words be clear.’. . . Pertinent also are ‘the history of the times, the circumstances surrounding the statute’s passage, and . . . attempted amendments.’ ” (Riley v County of Broome, 95 NY2d 455, 463-464 [2000] [citations omitted].) “We are also guided in our analysis by the familiar principle ‘that a statute . . . must be construed as a *297 whole and that its various sections must be considered together and with reference to each other.’ ” (Matter of New York County Lawyers’ Assn. v Bloomberg, 19 NY3d 712, 721 [2012] [citation omitted].)
Interpretation of the statute also raises policy concerns of state-municipal relations. Municipal regulation of outdoor advertising for aesthetic and safety purposes is an exercise of the municipality’s police power. (See RHP, Inc. v City of Ithaca, 91 AD2d 721 [3d Dept 1982].) Here, the City seeks to apply its police power to a state authority. The court is mindful that
“public authorities and other public benefit corporations are created to accomplish a specific purpose or mission and are endowed with the freedom and flexibility necessary to achieve that mission. They are ‘independent and autonomous’ to the extent that they should be free from requirements imposed on other State agencies that would interfere with the accomplishment of the public corporation’s purpose.” (Matter of Levy v City Commn. on Human Rights, 85 NY2d 740, 745 [1995].)
Thus, interpretation of the statute also presents the broader question of the degree to which the state legislature, by enacting Public Authorities Law § 1266 (8), intended to limit municipalities like the City of New York from regulating the operations of a state public authority. The broader that one construes the exception of “facilities that are devoted to purposes other than transportation or transit purposes,” the more power municipalities would have over the MTA, the NYCTA, and their subsidiaries, and the less autonomy these state entities would have.
L
Webster’s Third New International Dictionary, Unabridged[6] defines “transportation” as, among other things, “means of conveyance or travel from one place to another”; “the cost of such means of conveyance or travel”; “public conveyance of passengers, goods, or materials esp. as a commercial enterprise.” (Webster’s Third New International Dictionary, Unabridged 2430 [Merriam-Webster 1961].) “Transit” is defined *298 as, among other things, “the conveyance or carriage of persons or things from one place to another”; “the transportation esp. of people by means of bus, subway train, or other usu. local system of public conveyance”; “the system, vehicles, or facilities engaged in such transportation.” {Id. at 2428.) Thus, the plain, ordinary meaning of “transportation” and “transit” does not include generating revenue. Inasmuch as petitioners-plaintiffs point out that one of the MTA’s purposes is to generate revenue for regional public transportation, they essentially equate the meaning of “transportation and transit purpose” with the MTA’s purpose.
Only a few cases have interpreted the meaning of “facilities that are devoted to purposes other than transportation or transit purposes” under Public Authorities Law § 1266 (8).
In Matter of Penny Port, LLC v New York City Dept. of Health (Sup Ct, NY County, Sept. 14, 1999, Sklar, J., index No. 109291/ 99), a restaurant in Grand Central Terminal, which allowed smoking, brought a CPLR article 78 proceeding to declare that the City of New York lacked jurisdiction over the restaurant to enforce the City’s anti-smoking regulations. The restaurant argued that, because the City’s anti-smoking regulations conflicted with the MTA’s own regulations, which permitted smoking in specifically designated areas, the City had no jurisdiction under Public Authorities Law § 1266 (8). The City argued that the restaurant was not exempt from the City’s anti-smoking regulations because its premises were not devoted to “transportation purposes.”
The court rejected the City’s argument. The court in Matter of Penny Port, LLC noted that the Appellate Division, First Department had previously ruled that the portions of Grand Central Terminal being used as food stores, drugstores, and other commercial enterprises were incidental to Grand Central Terminal’s use for transportation purposes, and thus were tax exempt under Public Authorities Law § 1275. Because Matter of Penny Port, LLC involved another commercial enterprise within Grand Central Terminal, the court saw no reason to treat the restaurant differently for the purposes of Public Authorities Law § 1266 (8). The court stated,
“[T]his argument is foreclosed by the First Department’s holding in Metro. Transp. Auth. v City of New York, 70 AD2d 551 (1st Dept), lv denied 48 NY 607 (1979). In that case, the court considered a similarly-worded provision in PAL 1275, which *299 grants tax exempt status to ‘property leased by the [MTA] and used for transportation purposes.’ The Appellate Division agreed with the court below that ‘those portions of [Grand Central] which are used as food stores, drugstores, and other commercial enterprises, and which cater to both commuters and passersby, are nonetheless being used for transportation purposes’ (Metro. Transp. Auth., 70 AD2d at 551) (emphasis supplied). The court reasoned that ‘the commercial enterprises create revenue for the MTA and are incidental to transportation upon railroad facilities.’ (Id.)
“Although the City contends that the First Department was construing the term ‘transportation purposes’ only in the context of PAL 1275, there is no reason why the same definition should not apply equally to its use in PAL 1266.” (Matter of Penny Port, LLC, Sup Ct, NY County, Sept. 14, 1999, Sklar, J., index No. 109291/99, slip op at 5.)
Once the court in Matter of Penny Port, LLC accepted that a “facility” under Public Authorities Law § 1266 (8) meant Grand Central Terminal (and not just the restaurant), and that the Appellate Division had already ruled that those portions of Grand Central Terminal being used for commercial enterprises were incidental to Grand Central’s transportation purposes, the conclusion that Grand Central Terminal was not devoted to purposes other than transportation or transit purposes was inescapable. Matter of Penny Port, LLC, which petitioners-plaintiffs cite, appears to support their position here.
However, the court’s view of a “facility” in Matter of Penny Port, LLC appears to conflict with Terranova v New York City Tr. Auth. (49 AD3d 10 [2007]). In Terranova, the Appellate Division, Second Department ruled that an ejector pump room at a bus depot was subject to the New York City Building Code. The Appellate Division reasoned that, although the bus depot was “not unrelated to the Transit Authority’s role as a provider of transportation services,” the ejector pump room “is not, in itself, ‘devoted to . . . transportation or transit purposes.’ ” (Id. at 15.) Unlike the Supreme Court in Matter of Penny Port, LLC, the Appellate Division, Second Department took a narrow view of the meaning of “facility.” The Appellate Division, Second Department considered the ejector pump room as a facility unto itself, instead of being a portion of a larger facility (like a restaurant as being part of Grand Central Terminal). *300 Applying the logic of Terranova to the facts in Matter of Penny Port, LLC, it could have been argued that, although Grand Central Terminal provides transportation services, the restaurant itself was not “devoted” to a “transportation or transit purpose.”
The narrow, piecemeal view of a “facility” in Terranova could lead to inconsistent results. Although the ejector pump room in the bus depot in Terranova was not “devoted” to transportation or transit purposes, other areas of the bus depot were used to provide transportation services. Thus, Terranova implies that, as one moves throughout the single structure of the bus depot, some areas would be subject to the New York City Building Code, while others would be exempt. This hodgepodge of regulation and exemption governing a single structure is impracticable; it would be as confusing to the City as it would be to the public authority.
The Public Authorities Law does not define “facilities” so narrowly. As petitioners-plaintiffs indicate, the definition of “railroad facilities” in the Public Authorities Law contemplates that some portions of MTA facilities may be used to generate revenue:
“ ‘Railroad facilities’ shall mean right of way and related trackage, rails . . . stations, terminals, storage yards, repair and maintenance shops, yards, equipment and parts, offices and other real estate or personalty used or held for or incidental to the operation, rehabilitation or improvement of any railroad operating or to operate between points within the district or pursuant to joint service arrangements, including but not limited to buildings, structures, and areas notwithstanding that portions thereof may not be devoted to any railroad purpose other than the production of revenues available for the costs and expenses of all or any facilities of the authority.” (Public Authorities Law § 1261 [13] [emphasis supplied].)
Thus, the fact that a portion of a railroad facility, such as a portion of a railroad right-of-way, is used to generate revenue does not mean that the entire facility is therefore devoted to a purpose other than transportation or transit purposes.
The City reads “except for facilities that are devoted to purposes other than transportation or transit purposes” to mean that facilities devoted only to transportation or transit purposes are exempt from the statute. (City’s mem at 13.) *301 However, this interpretation could be said to conflict with the definition of “railroad facilities” in Public Authorities Law § 1261. Moreover, it does not logically follow that the converse of a facility “devoted to purposes other than transportation or transit purposes” is a facility devoted to transportation or transit purposes. It is true that a facility used entirely for transportation or transit cannot, by definition, be devoted to a purpose other than transportation or transit. However, it does not follow that a facility that is not entirely used for transportation or transit is necessarily devoted to another purpose.[7]
On the other hand, this court need not adopt the interpretation espoused by petitioners-plaintiffs, that generating revenue for the MTA is, in itself, a “transportation or transit purpose” under Public Authorities Law § 1266 (8). Such an interpretation, which expands the plain, ordinary meaning of “transportation” and “transit,” might have broad repercussions for the development of any real property owned by the MTA (including the question of whether such development would be subject to any local laws at all). Moreover, following the logic of petitioners-plaintiffs, every MTA facility that leases space to an advertising company for an outdoor sign would be considered as serving a “transportation or transit purpose” (and therefore exempt from all local law and regulation), even if the outdoor sign generated as little as $0.01 in revenue.
This court need not adopt that interpretation in these three cases; neither is it necessary to read Matter of Penny Port, LLC to stand for such a broad proposition. The outdoor signs did not render the railroad facilities here unusable as railroad rights-of-way, trestles, and overpasses; these facilities continue to function as part of a system for moving trains and transit equipment. Nothing in the record indicates that the outdoor signs affected this function in any way.[8] Thus, it cannot be said that the MTA facilities at issue are devoted to purposes other than transportation or transit purposes.
This court declines to follow People v Witherspoon and a 1982 opinion from the New York State Attorney General discussing *302 People v Witherspoon (1982 Ops Atty Gen 73), both of which the City cites in opposition to the petitions. As discussed above, the District Court in Witherspoon analyzed the exemption from local law under Public Authorities Law § 1266 (8) as a question of governmental immunity. The City acknowledges that, in 1988, the Court of Appeals jettisoned the governmental-proprietary function test. (Matter of County of Monroe [City of Rochester], 72 NY2d 338, 341 [1988] [“We conclude that the time has come for retiring this labeling device”].) Thus, the precedential value of People v Witherspoon is questionable.[9] The City nevertheless urges the court to follow the conclusion of People v Witherspoon, that the erection and maintenance of outdoor advertising is merely incidental to the governmental function for which the MTA was created. (City’s mem at 9.) However, the conclusions of People v Witherspoon cannot be divorced from the governmental-proprietary framework in which they were made, a framework which is at odds with more recent appellate precedents.[10]
For all these reasons, this court concludes that the MTA facilities at issue—i.e., the railroad rights-of-way, railroad trestles and overpasses upon which the 13 subject signs are affixed or erected—are not facilities devoted to purposes other than transportation or transit purposes, and therefore these facilities are exempt from the City’s Zoning Resolution, Local Law 14, Local Law 31, and title 1, chapter 49 of the Rules of the City of New York. These facilities are not subject to the jurisdiction of the City of New York, and the City may not enforce its Zoning Resolution as to the outdoor signs located on *303 MTA property in these three cases.[11] Accordingly, DOB’s rejection of the sign registrations for these 13 signs and BSA’s resolution as to these 13 signs must be vacated and annulled.
The court cannot declare, as petitioners-plaintiffs urge, that every outdoor sign on all MTA property is exempt from local law and regulations. As discussed above, Public Authorities Law § 1266 (8) does not exempt from local law and regulations “facilities that are devoted to purposes other than transportation or transit purposes,” and the court does not adopt petitioners-plaintiffs’ argument that use of a facility to generate revenue is, in itself, a transportation or transit purpose. On this record, the court cannot find, as a matter of law, that there exist no facilities that are “devoted to purposes other than transportation or transit purposes”; neither can the court find, as a matter of law, that every MTA facility with an outdoor sign is devoted to a transportation or transit purpose.
2.
Given all the above, the court need not reach the remaining alternative arguments of petitioners-plaintiffs, insofar as these alternative arguments concerned outdoor signs on MTA property.
Finally, there is no indication that the City would not abide by the ruling of this court that the City is preempted from enforcing its Zoning Resolution with respect to signs on MTA property. Therefore, petitioners-plaintiffs’ request for injunctive relief is denied. (See Metropolitan Transp. Auth. v City of New York, 70 AD2d at 551-552.)
m.
As to the signs on CSXT’s railroad rights-of-way, CBS Outdoor argues that the Zoning Resolution does not apply to the signs on CSXT’s railroad rights-of-way. CBS Outdoor also challenges the rejection of its application to register these signs on two other grounds—what it terms the “unreasonable departure” doctrine, and violation of the City Administrative Procedure Act. (NY City Charter § 1041 et seq.)
*304 However, as a threshold matter, the court must address an issue of federal preemption raised in CSXT’s answer both as an affirmative defense against petitioners-plaintiffs and as a “cross claim” against the City, that to the extent that either petitioners-plaintiffs or the City
“purport to regulate or interfere with CSXT’s rail transportation activities and railroad operations along its railroad right-of-way, such state law claims are preempted by federal law. Specifically, any such state law claims or remedies are expressly preempted by Section 10501 (b) of the Interstate Commerce Commission Termination Act of 1995 (TCCTA’), 49 U.S.C § 10101, et seq. and/or the Supremacy Clause and the Commerce Clause of the Constitution of the United States of America.”
CSXT states that it asserted the defense of ICCTA preemption “in an abundance of caution ... in light of the unique regulatory issues that predominate this action.” (CSXT supplemental mem at 12.)
A.
As CSXT indicates, federal courts have ruled that the ICCTA “preempts most pre-construction permit requirements imposed by states and localities.” (Green Mtn. R.R. Corp. v Vermont, 404 F3d 638, 642 [2d Cir 2005].)
“ICCTA ‘preempts all “state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation.” ’ The pre-emption inquiry focuses on ‘the degree to which the challenged regulation burdens rail transportation.’ ” (Island Park, LLC v CSX Transp., 559 F3d 96, 102-103 [2d Cir 2009] [citations omitted].)
CSXT also acknowledges that preemption has limits. Green Mtn. held,
“Nevertheless, as the district court observed, ‘not all state and local regulations are preempted [by the Termination Act]; local bodies retain certain police powers which protect public health and safety.’ It therefore appears that states and towns may exercise traditional police powers over the development of railroad property, at least to the extent that the regulations protect public health *305 and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions. Electrical, plumbing and fire codes, direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption.” (Green Mtn. R.R. Corp., 404 F3d at 643 [citations omitted].)
Similarly, in Island Park, LLC, the United States Court of Appeals for the Second Circuit stated, “We think it important to emphasize that although ICCTA’s pre-emption language is unquestionably broad, it does not categorically sweep up all state regulation that touches upon railroads—interference with rail transportation must always be demonstrated.” {Id. at 104.)
Zoning regulations barring advertising signs located on railroad rights-of-way or overpasses, which consequently limit the raising of advertising revenue for a commuter train system, do not have the effect of “managing or governing rail transportation” under federal case law (Island Park, LLC, 559 F3d at 102-103), and cannot be said to have an effect, if any, on “the movement of passengers or property, or both, by rail.” (See 49 USC § 10102 [9] [A].)
Thus, the court concludes that the local laws and regulations with respect to outdoor advertising on CSXT property or rights-of-way are not preempted by the ICCTA. CSXT’s “cross claim” is therefore dismissed.
B.
CBS Outdoor argues that the Zoning Resolution does not apply to railroad rights-of-way because they are functionally similar to streets, which are not covered under the Zoning Resolution. CBS Outdoor indicates that in the federal lawsuit involving Clear Channel, “The City states that the Zoning Resolution covers the City’s buildings and land, but ‘does not govern the use or development of the City’s streets and sidewalks.’” (Clear Channel Outdoor, Inc., 608 F Supp 2d at 490 [citation omitted].)
Section 11-111 of the New York City Zoning Resolution provides that, after December 15, 1961, the use and development of all zoning lots is governed by the Zoning Resolution. Thus, the issue of whether the Zoning Resolution applies to the *306 CSXT railroad rights-of-way depends on whether these railroad rights-of-way are located within a “zoning lot.”
The Zoning Resolution defines a “zoning lot” as a tract of land within a single “block” (see NY City Zoning Resolution § 12-10), and a “block” is defined as, among other things, “a tract of land bounded by: (a) streets; (b) public parks; (c) railroad rights-of-way.” (Id.) By definition, a “block” therefore does not include a railroad right-of-way. However, the City points out that a “zoning lot” is also defined as “lot[sj of record existing on December 15, 1961 or any applicable subsequent amendment thereto” (see NY City Zoning Resolution § 12-10), which does not depend on, and is not limited by, the definition of a “block.” Thus, it is irrevelant whether a railroad right-of-way falls under the Zoning Resolution’s definition of a “street,” if such a right of way is located on a lot of record existing on December 15, 1961.
Here, the BSA resolution of the CSXT appeals states, “DOB notes that the Appellant’s submissions lists blocks and lots of record for all Signs except for two, neither of which is on CSX property.” (R16; see also R100-105, R108, R115-116, R2283, R3155, R3232.) Thus, there is adequate support in the record to support the BSA’s determination that “the signs on CSX property are subject to zoning regulations.” (R17.) The Zoning Resolution is applicable to the outdoor signs on CSXT property because these outdoor signs are located on zoning lots, i.e., lots of record on December 15, 1961.
As the City points out, the City’s position in Clear Channel regarding its enforcement of the Zoning Resolution with respect to streets was made in the context of responding to Clear Channel’s argument regarding the lack of enforcement of the Zoning Resolution with respect to advertising on street furniture, i.e., bus shelters, phone kiosks and public toilets, a situation which is distinguishable from that presented in this litigation.
C.
Citing Matter of Charles A. Field Delivery Serv. (Roberts) (66 NY2d 516 [1985]), among other cases, CBS Outdoor argues that the City’s decision that it has the power to enforce the Zoning Resolution with respect to signs on CSXT’s property constitutes an unreasonable departure from prior policy and is, therefore, arbitrary and capricious.
As the Court of Appeals stated in that case, “Stare decisis is no more an inexorable command for administrative agencies *307 than it is for courts. They are, therefore, free, like courts, to correct a prior erroneous interpretation of the law by modifying or overruling a past decision.” (Id. at 518-519 [citations omitted].) In Charles A. Field Delivery Serv., the issue before the administrative agency was whether drivers working for the respondent were employees or independent contractors. As the Court of Appeals pointed out, whether an employer-employee relationship exists is basically a question of fact, and one which often arises in the context of Unemployment Insurance Law cases. On the basis of facts that were essentially identical to those of two prior cases which had been upheld by the Court of Appeals, the agency came to a diametrically opposite conclusion with respect to workers employed by Charles A. Field Delivery Service. Remanding the case to the Unemployment Insurance Appeal Board, to reconsider the facts, the Court of Appeals stated:
“From the policy considerations embodied in administrative law, it follows that when an agency determines to alter its prior stated course it must set forth its reasons for doing so. Unless such an explanation is furnished, a reviewing court will be unable to determine whether the agency has changed its prior interpretation of the law for valid reasons, or has simply overlooked or ignored its prior decision.” (Id. at 520; see also Matter of Nozzleman 60, LLC v Village of Cold Spring Zoning Bd. of Appeals, 34 AD3d 682 [2d Dept 2006].)
Here, the question at issue is not one of fact, but rather a legal analysis of the City’s authority to enforce its own laws and regulations. CBS Outdoor effectively contends that the City cannot change its legal analysis without the matter being remanded to the BSA. The court disagrees. As the decision of the BSA indicates, however, the DOB stated the basis on which it had changed its legal analysis of its authority to enforce the Zoning Resolution with respect to signs on the property of CSXT. Therefore, it would be purposeless to remand the matter to the BSA. It is for this court to determine whether the City is indeed precluded from enforcing its Zoning Resolution with respect to those signs, and it has concluded that the City is not so precluded.
CBS Outdoor further contends that the City’s change in legal analysis constitutes the promulgation of a new regulation, without notice and comment in violation of City Administrative Procedure Act (CAPA). (NY City Charter § 1043 [b], [e].) The *308 court concludes, however, that the City’s change in its legal analysis of its authority to enforce its Zoning Resolution does not constitute rulemaking subject to CAPA.
“The rulemaking process is mandated when an agency establishes precepts that remove its discretion by dictating specific results in particular circumstances. [0]nly a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers constitutes a rule or regulation that must be formally adopted. Rules are not required for ad hoc decision making based on individual facts and circumstances.” (Matter of DeJesus v Roberts, 296 AD2d 307, 310 [1st Dept 2002] [citations and internal quotation marks omitted].)
IV.
Finally, petitioners-plaintiffs argue that DOB’s rejection of their applications for sign registration and the BSA resolutions must be annulled, because any enforcement efforts pursuant to those decisions would constitute an unconstitutional regulatory taking of private property under the Fifth and Fourteenth Amendments to the United States Constitution and article 1, § 7 of the New York State Constitution. In light of the court’s ruling that the MTA facilities bearing the 13 subject signs are not subject to the City’s law and regulations, the takings claim now concerns only 12 outdoor signs on CSXT property within CBS Outdoor’s inventory.
“Typically, takings claims involve the appropriation or occupation of property without the owner’s consent or, in the case of a regulatory taking, the enactment of legislation or an ordinance that is alleged to have destroyed the commercial value of a particular property.” (Matter of Walton v New York State Dept. of Correctional Servs., 13 NY3d 475, 489 [2009].)
“Our precedents stake out two categories of regulatory action that generally will be deemed per se takings for Fifth Amendment purposes. First, where government requires an owner to suffer a permanent physical invasion of her property— however minor—it must provide just compensation. See Loretto v. Teleprompter Manhattan CATV *309 Corp., 458 U.S. 419 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). A second categorical rule applies to regulations that completely deprive an owner of ‘all economically beneficial us[e]’ of her property. Lucas, 505 U.S., at 1019 (emphasis in original). . . .
“Outside these two relatively narrow categories (and the special context of land-use exactions . . . ), regulatory takings challenges are governed by the standards set forth in Penn Central Transp. Co. v. New York City, 438 U.S. 104 (1978). The Court in Penn Central acknowledged that it had hitherto been ‘unable to develop any “set formula” ’ for evaluating regulatory takings claims, but identified ‘several factors that have particular significance.’ Primary among those factors are ‘[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.’ Ibid. In addition, the ‘character of the governmental action’—for instance whether it amounts to a physical invasion or instead merely affects property interests through ‘some public program adjusting the benefits and burdens of economic life to promote the common good’—may be relevant in discerning whether a taking has occurred. Ibid. The Penn Central factors—though each has given rise to vexing subsidiary questions— have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or Lucas rules.” (Lingle v Chevron U. S. A. Inc., 544 US 528, 538-540 [2005] [citations omitted].)
The City points out that petitioners-plaintiffs may still be able to establish, on an individual basis, that some or all of the signs in question are entitled to the status of a legal nonconforming use. If that were the case, then petitioners-plaintiffs might be unable to show that, under Lucas, the Zoning Resolution deprived petitioners-plaintiffs of all economically beneficial use of the CSXT railroad rights-of-way,[12] or that, under Penn Central, the Zoning Resolution actually resulted in economic impact that interfered with distinct investment- *310 backed expectations (Lucas v South Carolina Coastal Council, 505 US 1003 [1992]; Penn Central Transp. Co. v New York City, 438 US 104 [1978]).
Matter of Ward v Bennett (79 NY2d 394 [1992]) is instructive. There, the New York City Board of Standards and Appeals affirmed the denial of the petitioners’ application for a building permit to build a single-family house in the bed of a mapped street which was unopened and undeveloped. The petitioners claimed that they were deprived of the use of their property without just compensation in violation of the United States Constitution and the New York State Constitution. The Supreme Court ruled that the takings claim was not ripe for determination, reasoning that the petitioners could seek to demap the street under the City’s Uniform Land Use Review Procedure. The Court of Appeals reversed, stating,
“the ripeness doctrine does not impose a threshold barrier requiring pursuit of all possible remedies that might be available through myriad government regulatory and legislative bodies. Indeed, we have said such a requirement might create a ‘bureaucratic nightmare’ and undue hardship. An aggrieved property owner could be effectively blocked from seeking meaningful judicial review of a confiscation claim until, for example, a change in governing law—a possibly excessively burdensome course of action, such as is presented in this case. Indeed, the relevant alternative relief here is available only through an elaborate demapping procedure, which is costly, cumbersome, lengthy and requires the final approval of the New York City Council, the ultimate legislative body of the City.” (Matter of Ward, 79 NY2d at 400-401 [citation omitted].)
The Court of Appeals noted, “[T]his is not a case . . . where some measure of administrative relief could still be obtained from the same governmental agency whose determination was being challenged, thus blocking judicial review for lack of ripeness.” {Id. at 400.)
Here, the status of legal nonconforming use of CSXT outdoor signs can be obtained from the DOB. Although petitioners-plaintiffs believe that they are not likely to meet the requisites for legal nonconforming use, the court agrees with the City *311 that whether a regulatory taking occurred is not ripe for judicial review.[13]
The BSA’s determination, which upheld the DOB’s rejection of the registration of these outdoor signs, and DOB’s rejection of the applications for sign registration of these signs on CSXT property, must be vacated to permit the matter to be remanded to DOB to consider whether these signs have the status of legal nonconforming use.
V
CSXT’s claim for common-law indemnification and contribution against the City, denominated as a counterclaim, is dismissed. Because CBS Outdoor’s regulatory takings claim is not ripe for adjudication, there are no damages for which CSXT could be presently held either vicariously liable (see Raquet v Braun, 90 NY2d 177, 183 [1997]), or jointly liable with the City. (See Guzman v Haven Plaza Hous. Dev. Fund Co., 69 NY2d 559, 568 [1987].) The court further notes that CSXT did not enact the local laws and regulations on which the alleged regulatory taking is based, and appears to be a nongovernmental entity. (See CSXT supplemental mem at 3.) From the perspective of an article 78 proceeding, the damages that CBS Outdoor seeks, based on a takings claim, is not incidental to the relief sought (see Metropolitan Taxicab Bd. of Trade v New York City Taxi & Limousine Commn., 115 AD3d 521, 522 [1st Dept 2014]), but rather is sought in the alternative.
Conclusion
Accordingly, it is hereby adjudged that the petition in CBS Outdoor Inc. v City of New York (index No. 100394/2013) is granted in part as follows: the resolution of the Board of Standards and Appeals, filed January 31, 2013, is vacated and annulled as to the determination of the New York City Department of Buildings related to nine outdoor signs on property of the Metropolitan Transportation Authority within the inventory of petitioner-plaintiff CBS Outdoor, Inc. (BSA calendar Nos. 117-12-A, 118-12-A, 125-12-A, 126-12-A, 128-12-A, 129-12-A, 131-12-A, 132-12-A, 133-12-A), and the notice of sign registration rejection letters issued by respondent-defendant New York City Department of Buildings to petitioner-plaintiff *312 CBS Outdoor, Inc. dated March 26, 2012 as to the nine signs are vacated and annulled; and it is further adjudged and declared that, in CBS Outdoor Inc. v City of New York (index No. 100394/2013) that the railroad rights-of-way, railroad trestles and overpasses of the Metropolitan Transportation Authority upon which the nine signs within the inventory of petitioner-plaintiff CBS Outdoor, Inc. are affixed or erected are not facilities devoted to purposes other than transportation or transit, that these facilities are not subject to the jurisdiction of the City of New York and are exempt from Local Law 14, Local Law 31, and title 1, chapter 49 of the Rules of the City of New York, and that the City of New York may not enforce its Zoning Resolution with respect to the nine signs maintained by petitioner-plaintiff CBS Outdoor on the property; and it is further adjudged that, in CBS Outdoor Inc. v City of New York (index No. 100394/2013), that the resolution of the Board of Standards and Appeals, filed January 31, 2013, as to the determination of the New York City Department of Buildings related to 12 outdoor signs on property of the CSX Transportation, Inc. within the inventory of petitioner-plaintiff CBS Outdoor, Inc. (BSA calendar Nos. 119-12-A, 120-12-A, 121-12-A, 122-12-A, 123-12-A, 124-12-A, 127-12-A, 134-12-A, 135-12-A, 180-12-A, 273-12-A, 274-12-A), is vacated and annulled, and the notice of sign registration rejection letters issued by respondent-defendant New York City Department of Buildings to petitioner-plaintiff CBS Outdoor, Inc. dated March 26, 2012, May 10, 2012, and August 8, 2012 as to the 12 signs are vacated and annulled, and the registration applications for these 12 signs are remanded to the New York City Department of Buildings to determine whether these signs may be registered as legal nonconforming uses; and it is further adjudged that the petition-complaint in CBS Outdoor Inc v City of New York (index No. 100394/2013) is otherwise denied; and it is further adjudged that, in CBS Outdoor Inc v City of New York (index No. 100394/2013), the counterclaim and cross claim of respondent-defendant CSX Transportation, Inc. are dismissed.

. Although the analysis is identical in all three lawsuits, separate decisions and judgments are issued in each lawsuit so as to permit entry of separate judgments. The decretal paragraphs of the judgments are specific to each lawsuit.

. Of the three outdoor advertising companies, only CBS Outdoor maintains signs on CSXT property.
CBS Outdoor’s petition-complaint originally alleged that signs are erected on, or affixed to property or facilities owned or leased by CSX Corporation. Accordingly, by an interim order dated November 18, 2013, this court directed CSX Corporation to be joined as a necessary party, and CBS Outdoor named CSX Corporation as a respondent-defendant in its amended verified petition. By consent, CBS Outdoor amended the pleadings again to name CSXT in lieu of CSX Corporation. Although CSXT is named as a respondent-defendant in CBS Outdoor Inc. v City of New York, its interests appear aligned with those of CBS Outdoor and the MTA.

. The record of the proceedings before the BSA consists of over 3,000 pages in seven separately bound volumes. Citations to the record of the proceedings are noted in this decision as “R” followed by the page number.

. According to CBS Outdoor, the BSA resolution incorrectly refers to calendar No. 129-12-A as being associated with property owned, leased, or controlled by the MTA instead of by CSXT. (CBS Outdoor second amended verified petition-complaint at 23 n 6.) The application for BSA appeal No. 129-12-A, for a sign located on Queens Blvd. and 74th Street, states that the owner of record is “Long Island Railroad/MTA.” (R110.) The statement of facts and findings submitted in the appeal application listed the “railroad property type” for the sign at Queens Blvd. and 74th Street (DOB No. 40074306) as the MTA. (R136, R169.)

. CBS Outdoor challenges the BSA resolution “with respect to all property or facilities owned or leased by the MTA, including outdoor advertising signs operated by any MTA licensee.” (CBS Outdoor second amended verified petition-complaint at 2 n 1 [emphasis supplied].)

. Webster’s Third New International Dictionary, Unabridged is an accepted authority for the plain and ordinary meaning of words for statutory construction. (See Matter of Balzarini v Suffolk County Dept. of Social Servs., 16 NY3d 135, 143 [2011] [citing online dictionary to define “exceptional”].)

. For example, suppose 97% of the space of a railroad facility is used for the movement of people, goods, or railroad equipment; from a quantitative perspective, such a facility is not devoted to purposes other than transportation or transit.

. It is not as if the entire facility were either converted to a non-transit or non-transportation use (such as an indoor shopping mall), or were demolished for construction of a football stadium and convention center, for luxury high-rise apartment rentals or for commercial office space.

. Citing People v Witherspoon, the court in People v Long Is. R.R. (45 Misc 3d 799 [Valley Stream Just Ct 2014]) denied a motion to dismiss summonses and informations issued to the Long Island Rail Road for violations of the Village Code of Valley Stream, due to high grass and weeds, excessive growth from trees overhanging railroad properties, and a large amount of debris and graffiti on Long Island Rail Road property. The court reasoned, “the charges against the LIRR are proprietary and not public in nature, and do not relate to its transportation purposes.” (Id. at 802.)

. The Appellate Division, First Department apparently revived the governmental-proprietary distinction in Echevarria v New York City Tr. Auth. (45 AD3d 492 [2007], supra), but only for the purpose of determining whether a conflict exists under Public Authorities Law § 1266 (8).
As discussed above, the existence of a conflict is not dispositive, because local laws and regulations will apply to MTA “facilities that are devoted to purposes other than transportation or transit purposes.” (Public Authorities Law § 1266 [8].)

. That is not to say that the MTA facilities at issue would be exempt from local law and regulation in perpetuity. The court’s determination that they are exempt is based on their present use for the movement of trains and equipment; it is conceivable that these facilities might no longer be exempt under Public Authorities Law § 1266 (8) should their use change in the future.

. CSXT itself did not assert a takings claim.

. The court does not opine on whether CBS Outdoor would have a valid takings claim if DOB were to deny its applications for registration of signs on CSXT property as prior nonconforming uses.